[Cite as *State v. Hensley*, 2021-Ohio-3702.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

BUTLER COUNTY

| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| Appellee, | : | CASE NO. CA2021-04-040 |
| | : | O P I N I O N |
| - vs - | | 10/18/2021 |
| | : | |
| STEPHEN HENSLEY, | : | |
| Appellant. | : | |

CRIMINAL APPEAL FROM HAMILTON MUNICIPAL COURT
Case No. 20CRB03364

Laura R. Gibson, City of Hamilton Prosecuting Attorney, for appellee.

Christopher P. Frederick, for appellant.

**PIPER, J.**

{¶1} Appellant, Stephen Hensley, appeals from his convictions in the Hamilton Municipal Court for violating a protection order and aggravated menacing.

{¶2} On October 19, 2020, Hensley was charged by complaint with aggravated menacing and violating a protection order, both misdemeanors of the first degree. The charges stemmed from an encounter Hensley had with his neighbor, Marandah Earl, on October 16, 2020. That day, Hensley was alleged to have violated an existing civil stalking

protection order ("CPO") in walking past Earl, who was in her front yard, and threatening her that he was going to "blow her brains out" and that she should watch her back.

{¶3} Hensley pled not guilty to the charges and a bench trial commenced on April 13, 2021. Earl testified first on behalf of the state. She stated that she and Hensley are neighbors, and that Hensley lives directly across the street from her. On October 15, 2020, Earl obtained the CPO against Hensley, which indicated he was to stay 50 feet away from Earl and her children and that he was not to have any contact with them.

{¶4} The following day, October 16, 2020, Earl was outside doing yardwork for several hours. Around 3:20 p.m., Hensley "kind of like snuck up behind" Earl while walking through her next-door neighbor's yard, "kind of startl[ing]" Earl. Earl indicated that Hensley was approximately 25 feet from her, and she noticed him walking through her neighbor's yard while she was leaf blowing. Earl asked Hensley to leave and informed him that he was violating the CPO. At that point, Hensley pulled the side of his shirt up, revealing a firearm in his waistband, and told Earl he was "going to blow [her] fucking brains out." Earl knew that Hensley owned a weapon and was under the impression that officers had previously discovered a weapon in Hensley's home.

{¶5} Earl then testified that Hensley continued walking towards his girlfriend's house, which was located across the alleyway, approximately 17 feet behind Earl's house. At that time, Earl went inside to call the police. She then returned outside to retrieve a copy of the CPO from her vehicle, at which point Hensley told her he was going to "blow [her] kids' brains out first" and that his girlfriend, Elsie, was taking him to their school. Earl then called the police again, as well as her children's school, to inform them of what Hensley had said. At that point, she observed Hensley and Elsie drive by her house in a red minivan in the direction of the school.

{¶6} On cross-examination, Earl was questioned about the written statement she

made to the police shortly after the incident. In her police statement, Earl stated Hensley approached her, as opposed to "snuck up" or "startled" her. The statement also omits any mention of Earl being within 25 feet from her, that he exposed a firearm to her, and that he threatened to "blow her kids' brains out." Earl acknowledged that although her written statement indicates Hensley "drove around her house," Elsie was actually driving and Hensley was in the passenger seat. Earl confirmed that Hensley does not drive and does not own a vehicle. Earl explained these inconsistencies by stating she was in a state of panic at the time, and that she mentioned most of the information to the officers, but was not as detailed as she should have been in her written statement.

{¶7} Earl was also cross-examined about Children Protective Services' ("CPS") placement of her half-sister, S.P., in her home three years prior to trial. S.P. had significant mental health problems, including carving that she wanted to die into her leg, and CPS removed S.P. from Earl's custody. Earl testified that although S.P. spent time alone with Hensley shortly before inflicting injury to her leg, and Hensley had called CPS on Earl several times prior to S.P.'s removal, she did "not blame [Hensley] entirely" for S.P.'s removal from her care.

{¶8} Earl was also questioned regarding messages Hensley received from a Facebook account displaying Earl's name and picture. The messages were derogatory and hostile towards Hensley, and included statements that Earl had discovered a way to get her CPO granted against Hensley and to get Hensley arrested for calling CPS, that she was going to shoot Hensley if he continued calling the police, that she would find someone to shoot Hensley, that Hensley needed help and was afraid to return to jail, that Hensley was a pedophile, and that she needed a firearm to take care of a neighbor problem. Earl denied writing the messages and claimed the Facebook profile was fake and created by Hensley to help him "in court." On redirect-examination, Earl explained she activated her Facebook

account in 2013 or 2014, while the account that sent the messages to Hensley was a "new Facebook account."

{¶9} Hamilton Police Officer Amanda Roach also testified at trial. Officer Roach stated that on the day in question, she went to the children's school in response to Earl's report of Hensley's threats and a "possible school shooting." When Officer Roach arrived at the school, she discovered Hensley in the passenger seat of a red minivan, which was parked in front of the school in the school's student pick-up line. At that point, Officer Roach made contact with Hensley and placed him under arrest. She then searched Hensley and the vehicle for weapons, but no weapons were discovered. According to the officer, Hensley was cooperative, and as far as she knew, he did not enter or interfere with the school.

{¶10} Following Officer Roach's testimony, the state rested its case-in-chief and Hensley and Elsie testified in his defense. Elsie testified that she is Hensley's friend and neighbor and had known him well for one year. According to Elsie, Hensley and Earl were also friends until September 2020 when S.P. was removed from Earl's home. Elsie believed Earl held a grudge against Hensley for S.P.'s removal.

{¶11} Regarding the day in question, Elsie testified Hensley came to her home around 2:30 p.m. The pair left her home at 3:40 p.m. to pick up her grandson from school. At the time, Elsie's grandson attended the same school as Earl's children. On the way to the school, the couple drove past Earl's house but Elsie was not looking to see if Earl was outside. Elsie stated she parked her minivan six blocks from the school's property and was not in a pick-up line. After parking, an officer quickly approached her vehicle. The officer confirmed the passenger was Hensley, held a gun, and began screaming at Elsie to unlock the door and get out of the vehicle. At that point, another officer arrived, who searched Elsie and Hensley, asked if they had any weapons, and searched the vehicle. According

to Elsie, she had seen Hensley every day for the past year, and had never seen him with a gun or heard him reference any gun that he owns.

{¶12} Elsie testified that Hensley did not leave her home after arriving until they left for the school. She further indicated Hensley did not walk near Earl's home on his way to her house and that she had never seen him cut through the yards to the alleyway. She claimed she watched Hensley walk around the block to avoid Earl's house completely, and that his entire walk was caught on her and Hensley's security cameras.

{¶13} Hensley testified that on the day in question, he woke up at 1:30 p.m. to let his dog out. While letting his dog out, Hensley noticed Earl outside "blowing leaves." He left for Elsie's shortly thereafter, and arrived at her home around 2:30 p.m. Hensley walked around the block to get to Elsie's home, which he estimated was "probably" 17 feet from Earl's home. After arriving at Elsie's, the couple left to pick up her grandson from school. Although they drove past Earl's house on the way to the school, Hensley indicated he did not pay attention to whether Earl was still outside. Hensley stated he was positive he did not say a single word to Earl that day, denied Earl's allegations entirely, and denied creating a fake Facebook account or fabricating the Facebook posts.

{¶14} On cross-examination, Hensley was questioned regarding his prior statement to Officer Roach that he sometimes carries a gun for protection. According to Hensley, he has never owned a weapon, but if he made such a statement to the officer, it was because his "head got slammed" into the hood of Elsie's vehicle that day, causing him to have a seizure.

{¶15} Hensley admitted that due to the seizure, he could not remember everything that happened that day. After the seizure, his mind was like "a blank state." Hensley testified regarding his existing medical condition, which causes him to have approximately one seizure per month, and depending on the severity of the seizure, it can "wipe out" his

memory of events that occurred before or after the seizure.

{¶16}  Upon questioning by the trial court, Hensley discussed his security cameras, which he claimed covers the area between his and Earl's houses and were in place when the incident occurred.  Hensley stated that the video did not have a time or date stamp, but his attorney had a copy of the video.

{¶17}  After Hensley's testimony, the defense rested without offering any exhibits into evidence.  The state then called Officer Roach as a rebuttal witness.  Officer Roach testified Hensley informed her he owned a firearm a few weeks prior to the October 16, 2020 incident.  The officer further indicated the minivan was not parked six blocks from the school that day, but was right next to the school's sidewalks and property.

{¶18}  Following closing arguments, the trial court discussed the charges and evidence on the record.  The trial court noted that it found Earl's testimony to be more credible than Hensley's.  The court stated, in relevant part:

> The Court heard the testimony in the case, and first from Ms. Earl, when she testified, the Court felt like when she was testifying that she was trying to tell the truth to the Court.
>
> She was cross-examined, but as she went through her testimony, it was truthful, from my perspective at least it would seem like she was trying to tell the truth.  * * *
>
> * * * And her conduct that day seemed to be consistent with someone who went through what she went through.  There is always backgrounds [sic] on these cases when there is [sic] neighbors involved.  * * *
>
> * * * And so the next day after he has got that [CPO], if he was - - the next day he is accused of violating that [CPO].  And from his testimony, the Court didn't feel like he was telling the truth about what happened.
>
> The Court felt like he was carefully trying to say things that he could maybe justify trying to say, like the thing about the gun.
>
> Well, he might have said - - he might have said he had a gun when they were banging his head on the car door.  Well, you

- 6 -

know, he said the thing about the gun * * * two weeks prior to that.

It had nothing to do with this incident, but he admitted that he had a gun. * * *

* * * When the officers approached him in that car, you could tell by the way he described that, they were looking for somebody with a gun. They came at him, their weapons out, yelling at her, turn the car, get the weapons out. They were told he had a gun.

Now, it happens a lot when people write up statements and then they get cross-examined on them, I always wonder whether it's reasonable to expect that they write down every aspect of something at the time something happens when they have to write out a statement.

I don't think that's the way the real world works. I think people write things down, but I believe she told the officers there was a gun here, because that's how they reacted to it.

And so - - so for all of those reasons, I believe the testimony when she said that he approached her that day and he spoke with her and he showed her a gun and he threatened her with it.

{¶19} The court then found Hensley guilty of violating the CPO and of aggravated menacing. The court sentenced Hensley to 180 days in jail, with 120 days stayed, and ordered Hensley to pay a $300 fine plus court costs. The court also imposed two years of community control upon Hensley's release, with a condition being no contact with Earl and her children.

{¶20} Hensley appealed his conviction, raising the following assignment of error:

{¶21} MR. HENSLEY'S CONVICTIONS WERE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶22} Hensley claims his convictions are against the manifest weight because Earl's testimony was not credible, was inconsistent, and was contradicted by other evidence. Thus, Hensley argues the trial court lost its way when it concluded Hensley recklessly violated the terms of the CPO and knowingly caused Earl to believe that he would cause

her serious physical harm.

{¶23} A manifest weight of the evidence challenge examines the "inclination of the greater amount of credible evidence, offered at a trial, to support one side of the issue rather than the other." *State v. Barnett*, 12th Dist. Butler No. CA2011-09-177, 2012-Ohio-2372, ¶ 14. To determine whether a conviction is against the manifest weight of the evidence, the reviewing court must look at the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether in resolving the conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *State v. Graham*, 12th Dist. Warren No. CA2008-07-095, 2009-Ohio-2814, ¶ 66. In reviewing a manifest weight challenge, an appellate court "must be mindful that the original trier of fact was in the best position to judge the credibility of the witnesses and the weight to be given the evidence." *State v. Hilton*, 12th Dist. Butler CA2015-03-064, 2015-Ohio-5198, ¶ 18. Thus, an appellate court will overturn a conviction due to the manifest weight of the evidence "only in the exceptional case in which the evidence weighs heavily against the conviction." *Graham* at ¶ 66, citing *State v. Thompkins*, 78 Ohio St.3d 380, 387, 1997-Ohio-52, (1997).

{¶24} Hensley was convicted of violating a protection order in violation of R.C. 2919.27, which provides that "[n]o person shall recklessly violate the terms of * * * [a] protection order issued pursuant to section * * * 2903.214 of the Revised Code." Here, the CPO issued against Hensley and in favor of Earl was introduced into evidence as State's Exhibit 1. That CPO includes provisions which prohibited Hensley from coming within 50 feet of Earl and her four children and prohibited Hensley from having contact or interfering with the children's school.

{¶25} Hensley was also convicted of aggravated menacing in violation of R.C. 2903.21, which provides that "[n]o person shall knowingly cause another to believe that the

offender will cause serious physical harm to the person or property of the other person, the other person's unborn, or a member of the other person's immediate family."

{¶26} In order to prove aggravated menacing, the state is not required to show that the offender is able to carry out the threat or even that the offender intended to carry out the threat. *State v. Salinger*, 12th Dist. Butler No. CA2014-10-208, 2015-Ohio-2821, ¶ 17. The state must, however, show that the victim had a subjective belief of fear of serious physical harm. *State v. Landrum*, 1st Dist. Hamilton No. C-150718, 2016-Ohio-5666, ¶ 9.

{¶27} Hensley argues the manifest weight of the evidence weighs heavily in favor of acquittal. Specifically, Hensley claims that Earl's allegations and testimony were so lacking in credibility that the trial court clearly lost its way in finding him guilty. In support, Hensley points to evidence that Earl had a "strong motive to falsely accuse" Hensley of committing criminal conduct; that Earl's written statement was materially different than her testimony; and that Elsie and Hensley's testimony established the allegations were completely false and impossible.

{¶28} After reviewing the record, we find that Hensley's convictions are not against the manifest weight of the evidence. Earl's testimony, if believed, establishes that Hensley violated the CPO by coming within 50 feet of her when he walked through her neighbor's yard on the way to Elsie's. Her testimony also establishes that Hensley threatened to cause serious physical harm to Earl and her children by shooting them. When considering Earl's calls to the police during the encounter, her report of a possible school shooting, and the decision to have her mother immediately pick up Earl's children, the record supports that Earl took Hensley's threats seriously and feared he would cause her or her children serious physical harm. Additionally, Earl knew Hensley could deliver on his threats, as she was aware that Hensley owned a firearm, he showed her a firearm in his waistband that day,

and went to her children's school as he said he was going to do.[1]   Thus, if the trial court believed Earl's testimony, it did not create a manifest miscarriage of justice in concluding that Hensley violated the CPO and knowingly caused Earl to believe that he would cause serious physical harm to her or her children.

{¶29}  "In a bench trial, the trial court acts as the factfinder and determines both the credibility of the witnesses and the weight of the evidence."  *State v. Lowry*, 12th Dist. Warren Nos. CA2019-07-070 and CA2019-07-071, 2020-Ohio-1554, ¶ 19.  The court "take[s] note of any inconsistencies in the witness' testimony and resolve[s] them accordingly, believing all, part, or none of each witness's testimony."  *State v. Schils*, 12th Dist. Clermont No. CA2019-08-067, 2020-Ohio-2883, ¶ 18.  Here, the trial court specifically noted Earl's inconsistent statements but nonetheless concluded that Earl was a credible witness.  Although Hensley highlights certain omissions from Earl's written statement, most notably that Hensley had revealed a weapon to her, we find that the essential elements of Earl's allegations remained consistent.  That is, Earl consistently maintained that Hensley walked near her and her home on the way to Elsie's and threatened to shoot her and her children.

{¶30}  Additionally, like the trial court, we find it is inconsequential that Earl failed to recite every detail of the incident in her written statement, as the record reflects Earl was in a panic when she wrote the statement and she testified she verbally informed the officers of the pertinent details, including that Hensley displayed a weapon.  This is consistent with Officer Roach's testimony that she responded to a "possible school shooting," as well as the officers' treatment of Hensley before his arrest.  Such facts are indicative of the officers' understanding that Hensley possessed a gun.

---

1. Notably, if Hensley had not told Earl he was going to the school, Earl would not have known that the police would find Hensley at the school.

{¶31} While Hensley and Elsie testified that Hensley did not own a gun, did not walk near or speak to Earl that day, and was at Elsie's home at the time of the alleged incident, the trial court was free to discredit their testimonies. Likewise, the trial court was free to believe that Earl did not fabricate the alleged contact with Hensley in response to a pre-existing grudge relating to S.P.'s removal from Earl's home. Contrary to Hensley's assertions, Earl specifically testified she did not blame Hensley entirely for S.P.'s removal from her care. "[W]hen conflicting evidence is presented at trial; a conviction is not against the manifest weight of the evidence simply because the tier of fact believed the prosecution testimony." *State v. Enoch*, 12th Dist. Butler No. CA2019-07-117, 2020-Ohio-3406, ¶ 27.

{¶32} The trial court specifically noted that, given the nature of their testimonies, Earl was more credible than Hensley.[2] The trial court was entitled to believe Earl's explanation of the encounter. As this court has previously explained, "credibility of the witnesses is paramount in cases * * * where the evidence amounts to little more than a matter of "he said, she said." *State v. Hurston*, 12th Dist. Butler No. CA2019-01-023, 2019-Ohio-3618, ¶ 17. Thus, we will not disturb the trial court's finding as to credibility, given the evidence does not weigh heavily in favor of acquittal.

{¶33} Accordingly, we find the trial court did not clearly lose its way or create a manifest miscarriage of justice when it convicted Hensley of violating a protection order and aggravated menacing. Hensley's assignment of error is therefore overruled.

{¶34} Judgment affirmed.

HENDRICKSON and BYRNE, JJ., concur.

---

2. The court specifically noted that Hensley was carefully choosing his words as if to "justify" his version of events.